IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| ROBERT SHERRELL, | ) | CIVIL NO. 05-00034 JMS/BMK |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | ORDER GRANTING IN PART AND |
| | ) | DENYING IN PART DEFENDANT |
| DONALD C. WINTER, in his | ) | WINTER'S MOTION FOR |
| capacity as the Secretary of the Navy, | ) | SUMMARY JUDGMENT |
| | ) | |
| Defendant. | ) | |
| | ) | |
| _____ | ) | |

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT
WINTER'S MOTION FOR SUMMARY JUDGMENT

## I. INTRODUCTION

Plaintiff Robert Sherrell filed suit against the Secretary of the Navy[1]

alleging that the Navy discriminated and retaliated against him in violation of Title

VII.  Plaintiff Sherrell argues that his supervisor, Louella Cazimero-Bactad,

publicly scolded him, failed to provide him with adequate training, placed him on

a performance improvement plan, and ultimately fired him on account of his race

and because he had filed a previous discrimination claim.  Defendant Winter

moved for summary judgment as to both claims, arguing that it was the Plaintiff's

---

[1] Donald C. Winter is substituted for his predecessor, Gordon R. England, as Secretary of the Navy, pursuant to Fed. R. Civ. P. 25(d).

poor work performance, rather than his race or past discrimination claim, that led to the Navy's actions.  Based on the following, the court GRANTS the Defendant's motion as to the discrimination claim and DENIES the Defendant's motion as to the retaliation claim.

## II. BACKGROUND

A.      Factual Background

Plaintiff Robert Sherrell ("Sherrell"), a 62-year-old African American male, was employed as a GS-11 Relocation Assistance Program Counselor ("RAP Counselor") at the Pearl Harbor Fleet and Family Support Center, Quality of Life Department.  As a RAP Counselor, Sherrell was under the direct supervision of Louella Cazimero-Bactad ("Cazimero-Bactad"), Manager of the Transition Assistance Program, Relocation Assistance Program, and Spouse Employment Assistance Program.  Sherrell was transferred to his post under a settlement agreement following a dispute in 2000 between Sherrell and Kathryn Koos-Lee ("Koos-Lee"), the Director of the Pearl Harbor Fleet and Family Support Center. Sherrell claimed that Koos-Lee discriminated against him when she attempted to fire Sherrell from his previous post at the Family Advocacy Program.  Koos-Lee

was involved in determining Sherrell's new position.[2]  Pl's. Ex. 5 at 400-01.  Pl's.

Ex. AAA ¶ 14.  Shortly after Sherrell's transfer, Koos-Lee was also transferred to

the Fleet and Family Support Center, where she assumed a position as Cazimero-

Bactad's supervisor.  Pl's. Decl. ¶¶ 11, 70.  To comply with the terms of the

settlement agreement, Director of the Pearl Harbor Quality of Life Department

Jasper Rogers Patrick ("Patrick") was to act as Sherrell's second-level supervisor.

Pl's. Ex. 5 at 384.

Sherrell claims that Cazimero-Bactad was likely aware of the

circumstances of his transfer; Cazimero-Bactad claims that she did not know the

details of the dispute and instead only knew that Sherrell was being transferred to

her department as the result of a settlement agreement under which Koos-Lee was

not to be involved in supervising Sherrell or his work.  Cazimero-Bactad Decl.

¶ 4; Pl's. Ex. 2 at 168-71; Pl's. Ex. 1 at 454.  Despite this, there is some evidence

that Koos-Lee was kept up to date on Sherrell's performance.  Pl's. Ex. 3 at 372;

Pl's. Ex. ZZ; Pl's. Ex. T; Pl's. Ex. V.

Sherrell's employment as a RAP Counselor started sometime in

December 2000.  The parties' accounts regarding Sherrell's service as a RAP

---

[2]  The court has not been provided with the details and exact date of this dispute; a
settlement agreement was apparently reached in December 2000 and signed in March 2001.  For
ease of reference, the court will refer to this dispute as the "2000 discrimination complaint."

Counselor differ in certain aspects.  For his part, Sherrell alleges that Cazimero-Bactad publicly referred to Sherrell as a "problem" prior to his start date and that Cazimero-Bactad admonished Sherrell in the presence of his co-workers (including sending an email regarding his various mistakes to his co-workers). Pl's. Ex. 1 at 453-55, 445-47, 448-50; Pl's. Ex. 2 at 19; Pl's. Ex. 4 at 422-23; Pl's. Ex. 7 at 478; Pl's. Ex. 9 at 21-15, 221-22, 227-29; Pl's. Ex. I.

Both parties agree that Cazimero-Bactad identified numerous problems with Sherrell's work product; that Cazimero-Bactad communicated these problems to Sherrell; and that Cazimero-Bactad attempted to implement various measures, the curative nature of which is disputed.  *See* Pl's. Exs. C-U.  Cazimero-Bactad first documented her concerns as to Sherrell's performance in a Performance Appraisal covering the period December 21, 2000 (shortly after Sherrell began work) to May 31, 2001.[3]  Def's. Ex. A.  Cazimero-Bactad evaluated Sherrell as "acceptable" in all categories, but included highly critical comments in narrative form, noting that Sherrell was "performing his duties at the low end of the 'Acceptable' rating"; that Sherrell's "work product is not consistent for

---

[3] The Performance Appraisal is a standard evaluation form which identifies seven general areas of job performance, rates the employee as either acceptable or unacceptable in each general category as based on several sub-qualifications, and provides space for written comments.

someone at the GS [level] 11"; that Sherrell "displays difficulty and weakness in performing his assigned duties"; and that Sherrell did not follow procedures when completing paperwork, was tardy in completing client records and was unresponsive to emails from colleagues.  *Id.*  Cazimero-Bactad concluded that Sherrell required improvement in "time management, prioritizing work, computer software training, improving typing skills, and presentation skills."  *Id.*

Following the critical written evaluation, the record reflects that Cazimero-Bactad had meetings with Sherrell on October 29 and 30, 2001 and November 20, 2001 regarding Sherrell's "failure to follow instructions and unprofessional conduct."  Def's. Ex. B.  Cazimero-Bactad documented the problematic performance issues discussed at these meetings in two letters to Sherrell dated November 2, 2001 and November 21, 2001.  Def's. Exs. B & C. The letters set out specific examples of areas where Sherrell failed to follow protocol; disregarded explicit instructions; failed to meet deadlines; did not complete assigned tasks; and made a comment in front of a client which Cazimero-Bactad considered unprofessional.  *Id.*  These letters were not official disciplinary actions but warned Sherrell that further mistakes could lead to formal discipline.

It was around this time that Cazimero-Bactad apparently began to

supervise Sherrell more closely.  Cazimero-Bactad met with Sherrell each week to review the status of his work and required him to prepare work plans reflecting the projects he was tasked with and the prioritization of his outstanding work.  By November 21, 2001, Cazimero-Bactad herself was emailing Sherrell detailed weekly task lists of client matters, related outstanding items, and status reports. The record contains 20 of these emails, some of them lasting several pages, which reflect overdue items and numerous mistakes.  Def's. Exs. D & E; Pl's. Exs. C-U. There is no record of Sherrell disputing or contradicting the accuracy of these emails.

Sherrell appears to have had a meeting with an EEO Counselor in the summer of 2002 regarding Cazimero-Bactad's behavior towards him.[4]  Pl's. Decl. ¶ 63.  In an email dated August 2002 from an EEO Specialist to Cazimero-Bactad (blind copied to others including Koos-Lee, Wong, and Rogers), the EEO Specialist writes that the complainant (presumably Sherrell) "made another allegation that I need you to respond to: 'Ms. Bactad took a new colleague around the Island for the Aloha Tour, but she told me . . . that I . . . could learn it on my

---

[4] Sherrell purports have filed an EEO complaint against Cazimero-Bactad in August 2002, which became formal in September of 2002.  Pl's. Concise Stmt. ¶ 44.  Sherrell also states that he received a letter of reprimand for this incident.  Pl's. Decl. ¶ 63.  Nothing in the record supports either assertion.

. . . own." Pl's. Ex. V.  Cazimero-Bactad disputed Sherrell's claim.  The court was not provided with any actual correspondence to the EEO Specialist, information regarding Sherrell's meeting with the EEO Specialist, or any details regarding the final resolution of this complaint.

   In June of 2002, Cazimero-Bactad placed Sherrell on a Performance Improvement Plan ("PIP").  Def's. Ex. F.  The PIP identified areas where Sherrell's performance was substandard, including serving as a resource person for the Relocation Assistance Program; developing classes for transitioning military personnel; complying with standard operating procedures; and working within proper administrative channels in performing program operations.  Def's. Exs. F & G.  The PIP established a work plan for Sherrell, including reporting directly to Cazimero-Bactad regarding any work problems, meeting with Cazimero-Bactad each week, copying Cazimero-Bactad on all outgoing emails, submitting reports of ongoing work at the end of each week, improving the quality of written communications, self-study regarding in-house procedures, and requesting appropriate training.  Def's. Ex. F.  Sherrell was informed that if his work did not improve during this 90 day period -- from June 20, 2002 to September 18, 2002 -- he would be fired.

   During the probationary period covered by the PIP, Cazimero-Bactad

identified over 100 errors made by Sherrell.  Some of the errors noted by

Cazimero-Bactad include failures to create required client files, to input correct

data on paperwork, to complete paperwork properly, to complete quality assurance

tests, to follow up with clients, to provide requested updates, to close out of the

shared Access computer program, and turn in task lists on time.  Def's. Ex. H.  In

most cases, Sherrell did not dispute or contradict the accuracy of Cazimero-

Bactad's findings, but instead alleges that these steps were not important,

necessary or appropriate or that they were new requirements which Sherrell did

not know of prior to the PIP.  Pl's. Ex. 13.  Sherrell's performance, and the 100-

plus errors, were documented in an October 2002 letter from Cazimero-Bactad to

Patrick in which Cazimero-Bactad proposed removing Sherrell from federal

employment.  Def's. Ex. H.  Patrick recommended releasing Sherrell from federal

employment.  Pl's. Ex. 5 at 385.

On November 5, 2002, Sherrell received a Notice of Proposed

Removal prepared by Cazimero-Bactad.  Sherrell was notified on January 14,

2003 that he was fired, effective January 18, 2003.

**B.**         **Procedural Background**

Sherrell filed an appeal of his termination to the Merit Systems

Protection Board on February 5, 2003.  The Merit Systems Protection Board

issued an Initial Opinion sustaining Sherrell's removal from federal employment on January 30, 2004.  Sherrell then timely filed a Petition for Review of the Board's Initial Opinion.  The Merit Systems Protection Board issued its Final Order on December 15, 2004 sustaining Sherrell's removal.  Sherrell received the Board's Final Order on December 21, 2004.

Sherrell filed suit before this court on January 19, 2005 seeking restitution, reinstatement, and relief.  The Defendant filed a motion for summary judgment on June 20, 2006.  The court heard oral arguments on the Defendant's motion on November 14, 2006.

### III.  <u>STANDARD OF REVIEW</u>

Summary judgment is proper where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  An issue of fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  An issue is material if the resolution of the factual dispute affects the outcome of the claim or defense under substantive law governing the case.  *See Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 919 (9th Cir. 2001); *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000).

When considering the evidence on a motion for summary judgment, the court must draw all reasonable inferences on behalf of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Unsubstantiated bald assertions by counsel are not sufficient to survive summary judgment. Nor will conclusory or speculative testimony pass muster. *Anheuser-Busch, Inc. v. Natural Beverage Distribs.*, 69 F.3d 337, 345 (9th Cir. 1995). Instead, the parties must show the court that a genuine dispute as to material facts exists through proffers of evidence which has an appropriate foundation and which is admissible under the Federal Rules of Evidence. If, after viewing this evidence in the light most favorable to the nonmoving party, the court nonetheless determines that a reasonable factfinder could not return a verdict for the nonmoving party, an entry of summary judgment is warranted.

As a regrettable aside, the court notes that many of the "facts" that Sherrell alleges are found in the legal memoranda and statement of facts -- but nowhere else. A triable issue of material fact cannot be created merely because Plaintiff's counsel declares it to be so. If counsel wishes the court to consider such "facts" on a motion for summary judgment, counsel should demonstrate that these "facts" are supported by the underlying documents, including declarations, deposition testimony, evidentiary exhibits, and the like. The court further notes

that Sherrell's legal filings are replete with extensions of the truth, exaggerated characterizations, and, at times, sloppy misrepresentations of the evidence included in the record.

## IV. ANALYSIS

**A.**      **Analysis Framework Under *McDonnell Douglas* Burden-Shifting Scheme**

The law does not proscribe discharges or reprimands due to poor performance; rather, Title VII makes unlawful those discharges which are due to discrimination or retaliation.  Claims of discrimination and retaliation in violation of Title VII are evaluated under the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).[5]

Under the *McDonnell Douglas* framework, a plaintiff employee must first establish a prima facie claim of discrimination or retaliation.  To do so, the plaintiff must offer evidence as to each element of the prima facie case.  *See Texas*

---

[5]  A plaintiff is not always required to establish his claim through the *McDonnell Douglas* burden-shifting framework.  The Ninth Circuit has noted that "when responding to a summary judgment motion, the plaintiff is presented with a choice regarding how to establish his or her case. [The plaintiff] may proceed by using the *McDonnell Douglas* framework, or alternatively, may simply produce direct or circumstantial evidence demonstrating that a discriminatory reason more likely than not motivated [the defendant]."  *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1122 (9th Cir. 2004).  Here, the court applies the *McDonnell Douglas* framework because it was applied by the parties themselves and because the Plaintiff has not offered direct or circumstantial evidence that a discriminatory or retaliatory reason more likely motivated the Defendant.

*Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981); *Sengupta v. Morrison-Knudsen Co., Inc.*, 804 F.2d 1072, 1074 (9th Cir. 1986).  "A plaintiff's failure to offer evidence establishing a necessary element of his *prima facie* case will ordinarily be fatal to his claim." (emphasis in original).  *Lyons v. England*, 307 F.3d 1092, 1113 (9th Cir. 2002).

The degree of proof necessary to establish a prima facie case on a motion for summary judgment is "minimal" or "very little" and "does not even need to rise to the level of a preponderance of the evidence."  *See Chuang v. Univ. of Cal. Davis*, 225 F.3d 1115, 1124 (9th Cir. 2000); *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 889 (9th Cir. 1994); *Sischo-Nownejad v. Merced Cmty. College Dist.*, 934 F.2d 1104, 1110-11 (9th Cir. 1991).  By establishing this relatively low threshold, the courts did not intend to render the standard devoid of meaning or substance.  Instead, the burden at this stage is structured to prevent imposing onerous or burdensome requirements which would disqualify plaintiffs from bringing claims even where defendants could not forward legitimate reasons for their actions.  Thus, at the prima facie stage, the plaintiff only need set forth some small amount of relevant, admissible evidence as to each element of the discrimination or retaliation claim.

After the plaintiff employee establishes a prima facie showing of

discrimination or retaliation, the burden of production under the *McDonnell Douglas* framework shifts to the defendant employer to forward a legitimate -- which is to say non-discriminatory or non-retaliatory -- reason for its actions. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).  This analysis does not shift the burden to prove discriminatory or retaliatory intent.  The "ultimate burden of persuading the trier of fact that the defendant intentionally discriminated [or retaliated] against the plaintiff remains at all times with the plaintiff."  *Texas Dep't of Cmty. Affairs*, 450 U.S. at 253.  Thus, the defendant need only present to the court a legitimate, non-prohibited rationale for its actions.

Once the defendant has forwarded a legitimate, non-discriminatory rationale for its actions, the burden shifts back to the plaintiff to establish that the specific rationale forwarded by the defendant is pretext for a motive prohibited by Title VII.  At this stage, the plaintiff needs to do more than merely deny the credibility of the defendant's proffered reason.  *See Schuler v. Chronicle Broad. Co.*, 793 F.2d 1010, 1011 (9th Cir. 1986).  Moreover, the plaintiff's "subjective personal judgments of [his] competence alone do not raise a genuine issue of material fact."  *Bradley v. Harcourt, Brace & Co.*, 104 F.3d 267, 270 (9th Cir. 1996).

The plaintiff can make a showing of pretext sufficient to survive

summary judgment in one of two ways.  First, the plaintiff can put forward an affirmative showing of evidence that the defendant is biased or that "a discriminatory [or retaliatory] reason more likely motivated the employer" when making the challenged termination decision.  *Texas Dep't of Cmty. Affairs*, 450 U.S. at 256.  Second, the plaintiff can show that the defendant's proffered explanation for its termination decision is "unworthy of credence" or otherwise not reliable.  *Id.*; *Lindahl v. Air France*, 930 F.2d 1434, 1438-39 (9th Cir. 1991).  The plaintiff can make either showing through direct or circumstantial evidence of discrimination.  *See Chuang*, 225 F.3d at 1124.[6]

Circumstantial evidence is that from which a court "would have to infer . . . that race [or retaliation] played an invidious role in the decision to lay [the plaintiff] off."  *Aragon v. Republic Silver State Disposal, Inc.*, 292 F.3d 654, 663 (9th Cir. 2002).   In order to survive summary judgment, the circumstantial evidence offered by the plaintiff "must be both *specific* and *substantial* to overcome the legitimate reasons put forth by [the defendant]."  *Id.* at 659 (emphasis in original); *Bodett v. CoxCom, Inc.*, 366 F.3d 736, 743 (9th Cir. 2004);

---

[6] Direct evidence "refers only to evidence (such as a racist or sexist statements) that proves the fact of discriminatory animus without the need for substantial inference."  *Coghlan v. American Seafoods Co.*, 413 F.3d 1090, 1096 n.8 (9th Cir. 2005).  Plaintiff's counsel agreed during oral argument that there was no direct evidence of either discrimination or retaliation in the case at hand.

*Goodwin v. Hunt Wesson*, 150 F.3d 1217, 1222 (9th Cir. 1998).[7]

Having set out the applicable framework for Title VII discrimination and retaliation claims, the court will now consider the claims raised in the present action.

**B.       Discrimination Claim**

Title VII makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race . . . ." 42 U.S.C. § 2000e-1(a)(1). A person suffers discrimination prohibited by Title VII "when he or she is singled out and treated less favorably than others similarly situated on account of race." *Jauregui v. City of Glendale*, 852 F.2d 1128, 1134 (9th Cir. 1988).  At issue is whether a reasonable jury could find that the treatment of Sherrell, including verbal reprimands, constant supervision of his job performance and work product, imposition of a PIP plan, and ultimate dismissal, were motivated by race rather

---

[7]   As this court has previously noted, there is some uncertainty as to the type and amount of circumstantial evidence a Title VII plaintiff need produce to successfully show pretext. *Kim v. Potter*, 2006 U.S. Dist. LEXIS 85818 *29-33, 2006 WL 3200361 *9-10 (D. Haw. Apr. 26, 2006). Although the Ninth Circuit has questioned whether a "specific and substantial" showing is proper for circumstantial evidence, it has not overruled the applicability of this standard. *See Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 130-31 (9th Cir. 2005).  Indeed, the Ninth Circuit has suggested that "specific and substantial" evidence may be necessary for direct, as well as circumstantial, evidence. *See Coghlan*, 413 F.3d at 1095.  The court therefore applies the "specific and substantial" standard to the present matter.

than performance.  To answer this question, the court applies the *McDonnell Douglas* framework.

### 1.    Sherrell Has Established a Prima Facie Case of Discrimination

To survive summary judgment, Sherrell must proffer admissible, credible evidence towards each element of a prima facie Title VII claim, including evidence showing that (1) he belongs to a protected class; (2) he was qualified for the position and was performing his job in a satisfactory manner; (3) he suffered an adverse personnel action at the hands of the defendant employer; and (4) the Navy treated similarly situated non-African American individuals more favorably than Sherrell.  *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993); *McDonnell Douglas*, 411 U.S. at 802; *Aragon*, 292 F.3d at 659.  As discussed in Part IV.A. *supra*, Sherrell need only produce a minimal amount of evidence to establish his prima facie discrimination case.

### a.    Membership in a protected class

Sherrell is African American and as such is protected by the provisions of Title VII.

### b.    Qualified for the position

Sherrell must establish that he was able to perform his job according

-16-

to the Navy's legitimate expectations.  The inquiry at this stage looks only at whether Sherrell was able to fill the descriptions of the job in the most rudimentary and basic sense and does not examine the Plaintiff's ultimate worthiness for the position.[8]

In making its determination as to whether Sherrell was qualified to be a GS-11 RAP Counselor for the purposes of setting forth a prima facie Title VII discrimination claim, the court gives probative weight to a variety of evidence, including Sherrell's self-assessment of his own performance and any external factors indicating that he was capable of fulfilling the duties of the position.  *See Aragon*, 292 F.3d at 660.  In the case at hand, most of the evidence available to the court enumerates the many ways in which Sherrell was not qualified or competent for the task at hand.  The evidence that the Plaintiff has ever performed satisfactorily -- at this or any other job -- is scarce, at least as reflected on the record.  As such, this case differs from matters wherein plaintiffs are found qualified for the position due to a history of strong performance, positive past performance evaluations, strong performance reviews from co-workers or other supervisors, or strong qualifications and credentials for the position.  However, the

---

[8]  To do otherwise would conflate the first and second prongs of the *McDonnell Douglas* framework and permit a defendant to defeat a prima facie case simply by asserting a legitimate, non-discriminatory rationale.

court has been able to find a few nuggets showing that Sherrell is capable of the job and placing him just over the very low threshold.  Specifically, Sherrell received positive feedback from some customers; a co-worker who intermittently acted in a supervisory role reviewed Sherrell's file and found it no worse than others she had seen; and ninety percent of Sherrell's Hawaiian cultural briefings were rated outstanding.  Pl's. Decl. ¶¶ 32, 69; Pl's. Exs. AA-SS.  Although a borderline case, the court, in consideration of the minimal standard applicable at the prima facie stage, finds that Sherrell has produced sufficient evidence to present a triable issue as to this element.

c.   <u>Adverse personnel action</u>

Title VII prohibits employers from discriminating against an individual "with respect to his compensation, terms, conditions, or privileges of employment."  42 U.S.C. § 2000e-2(a)(1).  Sherrell's termination clearly constitutes an adverse personnel action under the law.  *See Aragon*, 292 F.3d at 660; *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1281 (9th Cir. 2000).

d.   <u>Treatment of similarly situated individuals of a different<br>race</u>

Last, Sherrell must show that the Navy treated similarly situated non-African Americans more favorably.  *See Chuang v. Univ. of Cal. Davis*, 225 F.3d

-18-

1115, 1124 n.8 (9th Cir. 2000).  Similarly situated employees are those whose jobs

are similar to the plaintiff "in all material respects."  *Moran v. Selig*, 447 F.3d 748,

755 (9th Cir. 2006).  Sherrell does offer some evidence tending to at least

introduce the possibility that African Americans were treated less favorably than

their counterparts, namely that Cazimero-Bactad publicly scolded Lynn Willis, an

African American co-worker of Sherrell's and that Caucasian workers received

more training and assistance than Sherrell.[9]

Given the above, the court therefore finds that Sherrell has made a

prima facie case of race discrimination.

### 2.    The Defendant Has Forwarded a Legitimate, Non-Discriminatory Reason for Firing Sherrell

The court finds that the Defendant has forwarded a legitimate, non-

discriminatory reason for firing Sherrell: namely, that Sherrell failed to fulfill even

the most fundamental and basic of his job requirements.  Poor job performance is a

---

[9] In finding that Sherrell has met this prong of the prima facie case, the court rejects the Defendant's argument that Sherrell is required to prove that he was treated differently from other similarly situated poor performers of a different race.  This would be an unfair and overly burdensome requirement since it would allow the Plaintiff to proceed with his claim only if, by some opportune chance, he happened to be able to locate someone of a different race who performed at his exact same level of purported incompetence but who nonetheless remained in the Defendant's employ.  Accepting this argument would also require the court to assume the truth of the Defendant's asserted rationale (that Sherrell was fired for poor performance rather than due to racial discrimination) and thus would improperly conflate the first and the third prongs of the *McDonnell Douglas* framework.  *See Aragon*, 292 F.3d at 659.

legitimate, non-discriminatory reason for termination. *See Aragon*, 292 F.3d at 661. In the present case, the court finds that the Defendant provides ample evidence that Sherrell was performing well below the level expected of a GS-11 RAP Counselor which disrupted the services offered to clients and increased the work of Sherrell's co-workers and supervisors.

###    3.    Sherrell Has Failed to Show that the Defendant's Proffered Reasons for Sherrell's Removal are Pretextual

Sherrell argues that Defendant's stated reason for terminating Sherrell -- substandard work performance -- is a pretext. In support of this argument, Sherrell offers over 60 exhibits which, according to Sherrell, suggest that (1) Sherrell was doing a good job; (2) other employees made mistakes but were not fired; (3) Cazimero-Bactad referred to Sherrell as a "problem child" and intimated that she was not particularly thrilled to have him assigned to her unit; (4) Cazimero-Bactad also treated another African American employee poorly; and (5) Sherrell received a low level of training.[10] Even after considering this evidence in the light most favorable to Sherrell with all reasonable inferences drawn in his favor, the court finds that a factfinder could not reasonably determine that the Defendant's motives for terminating Sherrell were race, rather than performance,

---

[10] The Plaintiff admitted during oral argument that there is no direct evidence of pretext.

based.[11]  *See Chuang*, 225 F.3d at 1127.

> a.  <u>Sherrell did not offer evidence sufficient to show that he was performing his job in a satisfactory or acceptable manner</u>

The law does not proscribe terminating an employee for his poor performance; instead, it prohibits employers from firing an employee for being a member of a protected class (or, as discussed *infra*, for engaging in a protected activity).  Where the veracity of the employer's appraisal of the employee's work is disputed, there is a triable issue of fact as to whether the Plaintiff's subsequent discharge is legal.  Indeed, when performance failures do not justify the discharge, "courts infer, in the light of their experience, that the employment decision was more likely than not based on race."  *Gay v. Waiters' & Dairy Lunchmen's Union, Local No. 30*, 694 F.2d 531, 547 (9th Cir. 1982) (quotation marks and citations omitted).

Sherrell therefore could establish pretext by offering circumstantial evidence tending to show that his written work, administration of case files, ability to meet deadlines or follow instructions, etc., were satisfactory.[12]  A showing of

---

[11]  Although it applies the "specific and substantial" standard, *see supra* note 7, the court finds that Sherrell has failed to meet his burden even under the traditional summary judgment standard.

[12]  Unlike in the qualifications prong of the prima facie test discussed *supra*, however, Sherrell must offer more than his own personal assessment of his job performance.  "[A]n

qualifications sufficient to overcome pretext could be made through evaluations from former supervisors, testimony from his current colleagues regarding his work product, evidence of a history of a successful career, awards and letters of commendation for past job performance, and the like.  This type of evidence would permit a court to infer that a termination was in fact pretextual.

Sherrell offers no such evidence.  Instead, to demonstrate pretext, he alleges that some -- but not all -- customers were satisfied with the assistance he provided.  During oral argument, Sherrell's counsel argued that customer service was the primary essence of his job description and, as such, his satisfactory performance in this area indicates that an overall unsatisfactory rating was unwarranted.  The court disagrees.  Even if Sherrell had a perfect customer satisfaction rating, Sherrell has not shown that his many other professional failings were trivial or unimportant.  Sherrell's incompetence in meeting deadlines, being responsive, properly completing forms, and following applicable guidelines, along with numerous other problem areas, forced Cazimero-Bactad to redo Sherrell's work, create detailed work plans for him on a weekly basis, supervise him constantly, and ultimately led to a PIP and termination.  Cazimero-Bactad's

---

employee's subjective personal judgments of [his] competence alone do not raise a genuine issue of material fact."  *Bradley v. Harcourt, Brace & Co.*, 104 F.3d 267, 270 (9th Cir. 1996).

concerns with Sherrell's performance were documented as early as May 31, 2001--

six months after Sherrell began work -- and include "not knowing or remembering

the procedures in which to create client records, completing client records late, not

having clients sign the privacy act statement, having incomplete client records,

failing to follow instructions to check his e-mail in a timely manner, and not

responding to e-mail correspondence in a timely manner." Def's. Ex. A. These

same concerns are repeated in many emails from Cazimero-Bactad to Sherrell

from the period November 2001 to April 2002. *See* Def's. Exs. D, E & F; Pl's.

Exs. C-U; and in the Letter of Caution and Performance Improvement Plan dated

June 20, 2002, Def's. Ex. F.

    The record therefore fully demonstrates that Sherrell had significant

and numerous deficiencies in his performance. That Sherrell may have satisfied

some customers does not undermine the compelling proof that his work was

consistently substandard in many other areas. In other words, simply because

Sherrell did not fail miserably in every aspect of his job does not mean that the

Defendant did not have ample and legitimate cause to fire him.

> b.  <u>Different forms of discipline for other employees
> does not show that the proffered reason for Sherrell's
> discipline was pretextual</u>

    Sherrell claims that Cazimero-Bactad's disparate treatment of other

employees provides circumstantial evidence of pretext.  A common method to show pretext is to present evidence that other similarly situated employees outside of the plaintiff's protected class engaged in the same or similar conduct but were treated differently.  "In a case of alleged discriminatory discipline . . . the plaintiff must produce evidence that the acts of other employees who were not disciplined or were disciplined less severely were of 'comparable seriousness' to her infraction."  *Russell v. City of Kansas City, Mo.*, 414 F.3d 863, 868 (8th Cir. 2005); *see also Vasquez v. County of L.A.*, 349 F.3d 634 (9th Cir. 2003) (finding that a showing that employees outside the protected class with similar jobs and displaying similar conduct were treated more favorably is probative of intent); *Garret v. City & County of S.F.*, 818 F.2d 1515 (9th Cir. 1987) (stating that, in disparate treatment cases, a plaintiff can meet his burden by showing that other employees who engaged in similar acts of wrongdoing of comparable seriousness were retained).

The starting point for the court's analysis is the evidence presented by the Defendant, mostly unrebutted, that Sherrell's work performance was substandard in several regards.  Against this background, Sherrell has come forward with no evidence to prove that his co-workers were as incompetent or even nearly as incompetent.  Sherrell cites the testimony of two co-workers, Anya

Moore ("Moore") and Judy Aranaydo ("Aranaydo"), in an effort to show disparate discipline. Neither provides the support Sherrell claims. Aranaydo testified that, while serving as acting division head in Cazimero-Bactad's absence, she observed errors in the work product of two counselors. Cazimero-Bactad responded by arranging a meeting with the two counselors to discuss the problems. Aranaydo had no further information as to whether the counselors received a negative evaluation. This testimony provides no basis to draw an inference that Cazimero-Bactad disciplined Sherrell any differently than others, and certainly does not undermine the veracity of Cazimero-Bactad's claims that Sherrell was terminated due to his poor performance and not his race.

Moore's testimony likewise provides no support to Sherrell. She simply explained that she found errors in her own files, including "minor spelling errors, things like that," but "not really content [mistakes]." Pl's. Ex. 4 at 414. Sherrell asks the court to find pretext as, according to him, Cazimero-Bactad did not check Moore's work until prior to the EEO hearing. In fact, Moore testified that, "usually we would put [the work] into [Cazimero-Bactad's] box and then she would take it into her office. So I don't know what she's doing with it." Pl's. Ex. 4 at 416. Simply put, Sherrell has failed to present evidence that other employees' acts of misconduct were of "comparable seriousness" to those of Sherrell. As

such, that these employees may have received lesser discipline is irrelevant and provides no basis to presume pretext.

Sherrell also argues that Cazimero-Bactad's public scoldings are evidence of pretext.  Cazimero-Bactad's public reprimands of Sherrell were certainly unprofessional, but they do not constitute evidence of discrimination for the simple reason that others, including non-African Americans, were equally subject to the vagrancies of her wrath.  For example, the testimony of Judy Aranaydo and Francis Tomaszewski, both employees at the Fleet and Family Support Center, reveals that Cazimero-Bactad would discuss the performance problems of all employees in front of her staff.  Pl's. Ex. 7 at 48.  While Aranaydo shared that Cazimero-Bactad discussed Sherrell's poor performance more frequently than others, the Plaintiff has offered no evidence to show that this was due to his race.  Indeed, Sherrell admitted in his deposition that Cazimero-Bactad had privately reprimanded Fred McGhee, a fellow African American co-worker. Pl's. Ex. 6 at 505.  Thus, Sherrell has not shown that the disparity in his treatment was due to his race.

///

///

///

      c.   <u>A comment by Cazimero-Bactad referring to Sherrell as a "problem" is a stray remark rather than direct evidence of discrimination</u>

Sherrell argues that a comment made by Cazimero-Bactad in 2000[13] -- prior to Sherrell's transfer to Cazimero-Bactad's unit -- in which Cazimero-Bactad referred to Sherrell as a "problem," noted that she "didn't want him," but "was kind of like stuck with him" is evidence of discriminatory intent.  The court disagrees.

First, the court notes that Cazimero-Bactad's statement is not direct evidence of discriminatory animus as Cazimero-Bactad's comment does not even inferentially reference Sherrell's race.  *See Coghlan*, 413 F.3d at 1096 n.8 (describing direct evidence as that which "proves the fact of discriminatory animus without the need for substantial inference.").  The present case therefore differs from other cases where the animus of the defendant was evident through overtly racist comments.  *See, e.g., Chuang*, 225 F.3d at 1128-29 (finding direct evidence of discriminatory animus where reference was made to the plaintiff being a "Chink" and the plaintiff was told to "pray to [his] Buddha for help"); *Cordova v. State Farm Ins. Co.*, 124 F.3d 1145, 1149 (9th Cir. 1997) (finding direct evidence

_____

[13] Cazimero-Bactad disputes having used this phrase, but on summary judgment the court construes any factual disputes in the plaintiff's favor.

of discriminatory motive where plaintiff was referred to as a "dumb Mexican").

Similarly, the court finds that this single stray comment made by Cazimero-Bactad eighteen months before Sherrell was placed on a PIP and two years prior to Sherrell's termination is not circumstantial evidence of discrimination.  Stray remarks uttered in an ambivalent manner and not tied directly to the plaintiff's termination are insufficient to show discrimination.  *See Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1221, (9th Cir. 1998); *Nesbit v. Pepsico, Inc.*, 994 F.2d 703, 705 (9th Cir. 1993); *Merrick v. Farmers Ins. Group*, 892 F.2d 1434, 1438 (9th Cir. 1990).

> d. <u>Evidence of Cazimero-Bactad's treatment of Lynn Willis not sufficient statistical evidence to establish discriminatory intent</u>

Sherrell argues that Cazimero-Bactad's treatment of another African American employee, Lynn Willis ("Willis"), is statistical evidence of discrimination.  Statistical evidence is circumstantial by nature and requires the court to infer discriminatory intent based on a pattern of behavior.  Statistical evidence can only create a genuine triable issue of fact where (1) the statistical evidence is generated following reliable protocols and (2) where it shows a race-based pattern.

To demonstrate discriminatory intent, statistics must be derived from

a sufficiently large sample group so that the court may make the inferential step

that the numbers reliably establish a pattern of repeat discrimination, as opposed to

a mere coincidence the Defendant happens to have treated two African Americans

similarly.   Thus, where a sample size is too small, a court will not make statistical

inferences of intentional discrimination.   *See, e.g.,*   *Aragon*, 292 F.3d at 662-63

(declining to find statistical inference of discrimination where three of the four

garbage collectors laid off were white and the fourth "appear[ed] white");

*Sengupta*, 804 F.2d at 1075 (declining to give weight to statistical evidence

showing that from a pool of 28 total employees, four out of five dismissed

employees were African American); *Harper v. Trans World Airlines, Inc.*, 525

F.2d 409, 412 (8th Cir. 1975) ("[S]tatistical evidence derived from an extremely

small universe . . . has little predictive value and must be disregarded.").

  If reliable statistical evidence is available to the court, it "must show a

stark pattern of discrimination unexplainable on grounds other than [race]."

*Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1283 (9th Cir. 2000) (citations

omitted).   Thus, a plaintiff's statistical evidence must present a "stark pattern" and

"account for possible nondiscriminatory variables, such as job performance."

*Aragon*, 292 F.3d at 663.

  Sherrell's evidence does not pass muster as to either prong.   First,

Sherrell bases his statistical argument on the sample size of those under Cazimero-Bactad's supervision, or six individuals.  The court is unable to take any meaningful extrapolations from a data set of this size.  Second, Sherrell's evidence presents neither a stark pattern nor does it account for nondiscriminatory variables.  For example, although Willis believes that she was discriminated against, she testified that the discrimination was "more focused on my grade as being CS-5 as opposed to my race."  Pl's. Ex. 9 at 226.  Plaintiff also admits that a third African American employee, Fred McGhee, "did not receive the same less-than-respectful treatment" and was reprimanded in private.  Pl's. Decl. ¶ 41.

> e.   <u>Sherrell's training is not so low as to demonstrate discrimination</u>

Sherrell argues that the level of training he received was insufficient to prepare him for his job as a RAP Counselor and that the alleged failure to offer him adequate training evinces discriminatory animus.  In support of this contention, the Plaintiff offers examples of instances where he received training on a delayed basis, if at all, and the testimony of Aranaydo and Anya Moore, both of whom worked at the Fleet and Family Support Center.  Pl's. Decl. ¶¶ 25-27.

The court is not convinced that this evidence demonstrates racial

animus.[14]  Nothing in the record supports the Plaintiff's arguments that he was

denied training due to his race rather than due to some other factor.  For example,

Aranaydo's deposition testimony revealed that she was concerned that all of the

new temporary staff had received inadequate training and that there was another

new RAP counselor "who didn't know anything either."  Second, Moore points

out that Cazimero-Bactad did not provide her with training on the various

programs used by the office.  Even if Sherrell's training was inadequate, the record

reflects that non-African Americans also received similarly spotty training.

Sherrell has failed to show that the denial or delay of training was race-based.

     f.   <u>Sherrell has failed to show that other instances of disparate treatment were due to his race</u>

Last, Sherrell alleges that Cazimero-Bactad treated him differently in

a number of other ways, including leaving him out of conference presentations;

questioning him about his attendance at conference panels (but not questioning

another non-African American colleague); and scolding Sherrell for not parking in

his assigned parking spot (but not scolding other specific non-African Americans

for doing the same).  Pl's. Decl. ¶¶ 29, 33-36.  Sherrell's evidence may tend to

show that he was singled out, but it does not show that he was singled out on

---

[14]  The court does, however, find that this evidence is sufficient to introduce a triable issue of pretext as to the retaliation claim, which the court discusses *infra* Part IV.C.2.b.

account of his race.  These discrete instances over an extended period of time,

even if proven do not, on their own, establish a pattern sufficient to allow a trier of

fact to find that Sherrell was discriminated against.

Given the above, the court GRANTS the Defendant's motion for

summary judgment as to Sherrell's Title VII discrimination claims.

## C.    <u>Retaliation Claim</u>

Title VII also protects an employee from retaliation stemming from

the employee's participation in a protected activity.  42 U.S.C. § 2000e-3(a) ("It

shall be an unlawful employment practice for an employer to discriminate against

any of his employees . . . because he has opposed any practice [prohibited by Title

VII] . . . or because he has made a charge, testified, assisted, or participated in any

manner in an investigation, proceeding, or hearing under [Title VII]."); *Burlington*

*N. & Santa Fe Railway Co. v. White*, 126 S. Ct. 2405, 2410 (2006) ("Title VII's

anti-retaliation provision forbids employer actions that discriminate against an

employee . . . because he has opposed a practice that Title VII forbids or has made

a charge, testified, assisted, or participated in a Title VII investigation, proceeding,

or hearing.") (citations omitted).  The familiar *McDonnell Douglas* framework

also applies to Title VII retaliation claims.  *See McGinst v. GTE Corp.*, 360 F.3d

1103, 1124 (9th Cir. 2004).

### 1.    Sherrell Has Established a Prima Facie Retaliation Claim

To survive summary judgment, Sherrell must first forward admissible evidence as to each element of his claim.  To make a prima facie showing of retaliation under Title VII, a plaintiff employee must show that (1) the plaintiff engaged in a protected activity; (2) the defendant employer took an adverse action against the plaintiff employee; and (3) there was a causal link between the plaintiff employee's involvement in the protected activity and the adverse personnel action undertaken by the defendant employer.  *McGinst*, 360 F.3d at 1124; *Vasquez*, 349 F.3d at 646.

### a.    Sherrell engaged in a protected activity

Under 42 U.S.C. § 2000e-3, it is an "unlawful employment practice for an employer to discriminate against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice by this title or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this title."  It is clear that Sherrell once engaged in a protected activity, namely the filing of a racial discrimination complaint against the Navy's Family Advocacy Center (where he was previously employed as a social worker) sometime in 2000.

The closer question is whether Sherrell's contact with an EEO

Specialist in the summer of 2002 also constituted a protected activity.[15]  In his

Declaration, Sherrell states that he "went to see our employee assistance counselor

and EEO counselor Colleen Martineau" but does not specifically set forth the

issues he discussed with her.  Pl's. Decl. ¶ 63.  The only other evidence of this

contact on the record is an August 22, 2002 email from Colleen Martineau, the

Navy EEO Specialist, to Cazimero-Bactad, asking Cazimero-Bactad to respond to

Sherrell's allegation that "Ms. Bactad took a new colleague around the island for

the Aloha Tour, but . . . told [Sherrell] that [he] could learn it on [his] own."[16]

Pl's. Ex. V.  The record reveals nothing more about the facts or resolution of this

complaint.

From this evidence, the court can infer that Sherrell complained to an

EEO Specialist, but cannot infer that the content of Sherrell's communication

relates to an activity protected under Title VII.  An email or meeting alleging

disparate treatment due to racial discrimination would qualify as a "protected

---

[15]  In the Plaintiff's Concise Statement of Facts, Plaintiff's counsel declares that "Sherrell filed an EEO complaint against Bactad in August 2002.  It became a formal complaint in September 2002[.]" Pl's. Concise Stmt. ¶ 44.  To support this, Plaintiff's counsel cites Exs. V & QQ.  Nothing in these exhibits -- or the rest of the record -- comes close to adequately supporting counsel's bold statement.  Sherrell also claims in his declaration that he received a letter of reprimand for having contacted the EEO Specialist but offers no additional evidence to prove his point.  Pl's. Decl. ¶ 63.

[16]  In the same email chain, Cazimero-Bactad denied that she had taken the employee, identified in Sherrell's Declaration as his Caucasian co-worker Mike Burden, on the Aloha Tour. Pl's. Decl. ¶ 8.

activity" while an email or meeting complaining of disparate treatment due to non-prohibited reasons would not.  Based on the evidence presented by Sherrell, at most the court can infer that he complained that Cazimero-Bactad was treating him rudely or unfairly.  There is no evidence from which an inference can be drawn that Sherrell ever complained that this different treatment was based on race or in retaliation for his past discrimination claims.  Further, Sherrell has proffered no evidence to show that a Navy EEO Specialist can only consider matters made unlawful under Title VII as opposed to other claims of unequal treatment; indeed, according to Sherrell's Declaration, Martineau also held the title of "employee assistance counselor."  Pl's. Decl. ¶ 63.  The court thus has no basis upon which to conclude that the subject of Sherrell's contact with the EEO Specialist was one covered by Title VII and not a run-of-the-mill complaint.

The court therefore finds that a retaliation claim can be based on the 2000 discrimination complaint but that Sherrell's contact with an EEO Specialist in the summer of 2002 does not constitute a protected activity upon which a retaliation claim can be based.

b.   Adverse actions were taken

For the purposes of a Title VII retaliation claim, an action is cognizable as materially adverse if it is likely to dissuade or deter a reasonable

employee from pursuing a discrimination complaint. *Burlington*, 126 S. Ct. at 2415. Adverse actions are therefore not limited to those that affect the terms or conditions of one's employment. *Id.* at 2413-14.

It is self-evident that being fired is an adverse action. Moreover, a reasonable worker would likely find public scoldings, verbal berating, negative employment evaluations, and being placed on a PIP plan to be materially adverse since such actions could embarrass, stress, or intimidate an employee in such a way as to discourage him from pursuing future discrimination claims. The court thus finds that Sherrell has met this element.

     c.   <u>There is a causal link between Sherrell's involvement in the protected activity and the adverse action</u>

Finally, Sherrell must demonstrate "a causal link between the protected activity and the adverse employment decision." *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1064 (9th Cir. 2002). To establish causation, a plaintiff must show "by a preponderance of the evidence that engaging in the protected activity was one of the reasons for [his] firing and that but for such activity [he] would not have been fired." *Id.* at 1065 (citations omitted; brackets in original).

To show causation, "the plaintiff must make some showing sufficient

for a reasonable trier of fact to infer that the defendant was aware that the plaintiff had engaged in protected activity." *Raad v. Fairbanks N. Star Borough Sch. Dist.*, 323 F.3d 1185, 1197 (9th Cir. 2003)*; see also Cohen v. Fred Meyer, Inc.*, 686 F.2d 793, 796 (9th Cir. 1982) ("Essential to a causal link is evidence that the employer was aware that the plaintiff had engaged in the protected activity.").   The court finds that Sherrell has presented a triable issue as to whether Cazimero-Bactad knew that he had been involved in a previous discrimination complaint and then later retaliated against him by disciplining and firing him.   For example, the Plaintiff has produced some evidence tending to show that Cazimero-Bactad was aware that Sherrell had been involved in a prior complaint, that the complaint or dispute was directed against her supervisor Koos-Lee, and that Sherrell was being transferred to Cazimero-Bactad's division as a part of the settlement of that complaint.   Cazimero-Bactad blind copied Hazel Wong, a colleague in the EEO office who had been involved in the settlement of Sherrell's prior discrimination complaint, on many of her emails regarding Sherrell's poor performance.   Pl's. Ex. D; Pl's. Ex. G; Pl's. Exs. H-N; Pl's. Exs. P-T.   At one point, Cazimero-Bactad also stated that Koos-Lee had spoken with her about creating Sherrell's position. Pl's. Ex. 2 at 168.

Sherrell must next show that this knowledge was the possible basis

for Cazimero-Bactad's actions.  One way of demonstrating this is to provide direct

or "circumstantial evidence of a pattern of antagonism following the protected

conduct."  *Porter v. Cal. Dep't of Corr.*, 419 F.3d 885, 895 (9th Cir. 2004).  A

court may infer causation from the proximity of the timing between the plaintiff's

protected activity and the defendant's actions.  *Ray v. Henderson*, 217 F.3d 1234,

1244 (9th Cir. 2000) (*quoting Yartzoff v. Thomas*, 809 F.2d 1371, 1371 (9th Cir.

1987) ("That an employer's actions were caused by an employee's engagement in

protected activities may be inferred from 'proximity in time between the protected

action and the allegedly retaliatory employment decision.'"); *see also Passantino*

*v. Johnson & Johnson Consumer Prods., Inc.*, 212 F.3d 493, 507 (9th Cir. 2000);

*Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir. 1987).  On the other hand,

temporal distance may make it more difficult to prove causation.  *See Porter*, 419

F.3d at 895; *see also Manatt v. Bank of America, NA*, 339 F.3d 792, 802 (9th Cir.

2003) (finding that nine months is not sufficiently close to create causal link);

*Vasquez*, 349 F.3d at 646 (finding that a 13-month gap was too long to establish

causal connection); *Villiarimo*, 281 F.3d at 1065 (noting that a lapse of 1.5 years

was too long to establish causal connection).  Here, Sherrell alleges that Cazimero-

Bactad began treating him poorly immediately following his transfer, including

making negative comments about him before he began work, and making rude

-38-

comments to him at his second or third staff meeting.

These facts are sufficient for a reasonable jury to infer that Cazimero-Bactad was aware of Sherrell's previous discrimination claim against Koos-Lee and that she may have acted based upon this knowledge.[17]  As such, Sherrell has made a prima facie discrimination claim.

### 2.     Sherrell Has Offered Sufficient Evidence to Raise a Triable Issue of Material Fact that Defendant's Reasons Were Pretextual

Because the Defendant has offered a legitimate, non-retaliatory reason for firing Sherrell -- namely Sherrell's on the job incompetence -- the burden now shifts to Sherrell to submit evidence showing that the proffered explanation is pretextual.  The Plaintiff's burden at this stage requires him to offer evidence of a genuine factual dispute as to whether he was treated differently on account of his having filed a discrimination claim in the past -- and not due to some other factor.  Essentially, Sherrell needs to offer admissible evidence that the

---

[17]  Even if the court had found that Sherrell's contact with an EEO Specialist in the summer of 2002 was a protected activity, there is not sufficient evidence of causation to make a prima facie case as to retaliation for that complaint.  Sherrell knew, at the time that he contacted the EEO Specialist, that there were disciplinary actions being taken against him due to his poor performance.  The reply from the EEO Counselor was dated in August 2002; by that time, Sherrell had already been placed on a PIP.  A plaintiff who is aware of concerns regarding his work cannot use the complaint mechanisms of the EEO to shield himself from the ramifications of his poor performance.  *See Swanson v. Gen. Servs. Admin.*, 110 F.3d 1180, 1188 n.3 (5th Cir. 1997) ("If timing *alone* were enough, any action taken against [the plaintiff], no matter how justified, could be sustained as discriminatory.") (emphasis in original).

Defendant's version of the events -- that Sherrell was not competently performing

his duties -- was manufactured as a pretext to retaliate against him. Viewing the

evidence cumulatively and in the light most favorable to Sherrell, the court

determines that Sherrell has offered sufficient evidence so as to raise a triable

issue of material fact as to pretext.

> a.   <u>Sherrell has presented a genuine issue as to whether the
> disparate treatment he received was retaliatory</u>

Sherrell alleges that Cazimero-Bactad treated him unfairly and

unprofessionally from the start of his employment.  For example, Sherrell offers

evidence that Cazimero-Bactad embarrassed him at his second or third staff

meeting by saying that he could take over a presentation on stress because Sherrell

"knew a lot about stress."  Pl's. Ex. 6 at 504.  Sherrell claims that this

unprofessional treatment continued throughout his tenure: Cazimero-Bactad

allegedly admonished Sherrell for his poor presentations in front of staff and

customers while she addressed his co-workers in private; prohibited Sherrell from

working overtime or through lunch to catch up on his work -- even when he was

willing to do so without pay -- while other employees were allowed to take work

home; admonished Sherrell for parking in the wrong place even while others were

allowed to do so; and prohibited Sherrell from requesting or receiving assistance

with computer issues.  Pl's. Decl. ¶¶ 16 & 17; Pl's. Ex. 6 at 505; Pl's. Ex. 7 at 484-

85; Pl's. Ex. 6 at 506; Pl's. Ex. 9 at 211.[18]  Considering that this disparate

treatment of Sherrell began almost immediately after Sherrell's transfer to

Cazimero-Bactad's division, a jury could infer that Cazimero-Bactad was

retaliating against Sherrell for filing a discrimination complaint against Koos-Lee.

      b.   <u>Denial of training evinces possible retaliatory animus</u>

      As part of the settlement agreement for his discrimination claim

against Koos-Lee, Sherrell was to be transferred to a new position.  From the start,

Sherrell was concerned about being placed in Cazimero-Bactad's division because

he felt that his developed skill set was not sufficient for a position as a RAP

Counselor.  Pl's. Decl. ¶¶ 9-11.  Prior to the transfer, however, Sherrell claims he

was assured that he would "be provided the necessary training to succeed in the

new position."  Pl's. Decl. ¶ 12.  Contrary to Sherrell's expectations and needs, he

claims that the training he received was inadequate, delayed, or outright denied.

Pl's. Decl. ¶¶ 19-21 & 25-28.  Cazimero-Bactad herself admits that Sherrell

"didn't have the type of orientation that new employees first coming to the Fleet

---

[18]  The court does not include as a basis for its finding an anonymous complaint to a
Concerns Committee member that Cazimero-Bactad had a habit of embarrassing Sherrell (and
another co-worker) in front of staff and clients since the note is inadmissible hearsay.  Pl's. Ex.
XX.

and Family Support had where the person would meet with all of the division

heads and the director.  He came in and basically we kind of just talked and went

over some things that he could do under the relocation program." Pl's. Ex. 2 at 17.

Sherrell felt his training was so inadequate that he joined the Toastmasters to help

him with his presentation skills.  This lack or delay in training may have adversely

affected Sherrell's job performance.  For example, a delay in PowerPoint training

allegedly led Sherrell to perform poorly at a presentation, a failure that Cazimero-

Bactad later publicly criticized him for.  Pl's. Decl. ¶ 39.  That Sherrell was aware

that he needed training in order to perform his job (and indeed explicitly requested

and was promised training prior to his transfer) but was nonetheless denied the

opportunity to receive this training in a timely manner (even when other

colleagues did), could be reasonably interpreted by a jury as evidence that

Cazimero-Bactad was setting Sherrell up to fail in retaliation for his previous

discrimination complaint.

       c.    Involvement of Koos-Lee suggests possible retaliation

      Sherrell argues that Cazimero-Bactad's involvement of Koos-Lee in

certain situations went against the express terms of his settlement agreement and is

circumstantial evidence of retaliation.  There is some evidence to support this

allegation, namely that Koos-Lee was blind copied on the emails from the EEO

Specialist; that Cazimero-Bactad blind copied Koos-Lee on at least one email

discussing Sherrell's performance; that Sherrell's work product ended up in Koos-

Lee's possession; that Cazimero-Bactad and Sherrell went to Koos-Lee's office to

discuss a dispute; and that Cazimero-Bactad brought the Chelcey Silva[19] matter to

Koos-Lee's attention.  Pl's. Ex. 2 at 15.; Pl's. Ex. 3 at 372;  Pl's. Ex. T; Pl's. Ex.

V; Pl's. Decl. ¶ 15; Pl's. Ex. ZZ.  From this evidence, a reasonable factfinder

could determine that Koos-Lee was involved in Sherrell's supervision and that

such involvement might be probative of a retaliatory animus on the part of her

supervisee, Cazimero-Bactad.

> d.   Cazimero-Bactad's reference to Sherrell as a "problem"
>      suggests pretext

Sherrell argues that Cazimero-Bactad's disparaging remarks that

Sherrell was a "problem" who Cazimero-Bactad "didn't want" but "was kind of

like stuck with him" shows retaliatory pretext because they impliedly pass

judgment on his past protected activity of filing a discrimination complaint against

---

[19]   Sherrell apparently left a note for co-worker Chelcey Silva ("Silva") on her desk.  The note read "Chelase [sic] (sp) I am holding my breath waiting on you" with an unhappy face drawn on the note.  Pl's. Ex. VV.  Silva was unsure of who had written the note and showed it to Cazimero-Bactad.  According to Sherrell, Cazimero-Bactad pressured Silva to file a harassment claim against Sherrell.  Pl's. Ex. TT.  Since there is no testimony discussing the incident from Silva, the supposed pressure to file a harassment claim is hearsay and outside the bounds of what the court will consider.  All that is relevant here, then, is that Cazimero-Bactad purposefully notified Koos-Lee about a problematic situation, despite the terms of the settlement agreement.

Koos-Lee.  While these remarks are not direct evidence of retaliatory animus (as they require additional inferences by the court), the court finds that, if true, the remarks are circumstantial evidence that Cazimero-Bactad was predisposed against Sherrell prior to the start of his work in her division.  Referring to an employee as a "problem" could be interpreted by a reasonable trier of fact to refer to someone who liked to "rock the boat" and had filed past discrimination complaints.  Whether Cazimero-Bactad made this statement, and what meaning should be accorded to the statement, is for a jury, and not the court, to decide.

Given the above, the court finds that Sherrell has offered sufficient evidence to proceed with his retaliation claim based upon filing the 2000 discrimination complaint, but that Sherrell has not offered sufficient evidence to proceed with a retaliation claim based upon his contact with an EEO Specialist in the summer of 2002.  The court thus DENIES the Defendant's motion as to the retaliation claim based upon the 2000 discrimination complaint and GRANTS the Defendant's motion as to the retaliation claim based upon the Plaintiff's contact with an EEO Specialist in the summer of 2002.

///

///

///

## V.  <u>CONCLUSION</u>

For all of the above reasons, this court GRANTS the Defendant's motion for summary judgment as to the discrimination claim and DENIES the Defendant's motion for summary judgment as to the retaliation claim.

IT IS SO ORDERED.

DATED: Honolulu, Hawaii, January 8, 2007.



J. Michael Seabright
United States District Judge

*Sherrell v. Winter*, Civ. No. 05-00034 JMS/BMK, Order Granting in Part and Denying in Part Defendant's Motion for Summary Judgment